IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RICHARD P. HARROLD,

        **Plaintiff,**

    **v.**                                     Civil Action No. 3:23cv866

LEWIS J. HAGEN III, *individually and in his
official capacity as an Officer of the
Chesterfield County Police Department,
Chesterfield County, Virginia,*

        **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Lewis J. Hagen III's ("Officer Hagen")

Motion to Dismiss (the "Motion to Dismiss").[1]  (ECF No. 5).  Plaintiff Richard P. Harrold

responded in opposition, (ECF No. 8), and Officer Hagen replied, (ECF No. 10).  On January 25,

2024, Mr. Harrold filed a Motion Requesting Oral Argument (the "Motion for Hearing").  (ECF

No. 9.)

The matter is ripe for disposition.  The Court dispenses with oral argument because the

materials before it adequately present the facts and legal contentions, and argument would not

aid in the decisional process.  Therefore, the Court will DENY the Motion for Hearing.  (ECF

No. 9.)

For the reasons articulated below, the Court will GRANT the Motion to Dismiss.  (ECF

No. 5.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I.  Factual and Procedural Background

### A.    Factual Background[2]

Mr. Harrold is a resident of Virginia who is in his late forties. (ECF No. 1 ¶¶ 6, 18.) He
is "approximately five feet, ten inches tall" and at all times relevant to this action, "weighed 145
pounds." (ECF No. 1 ¶ 19.) He is also a below-the-knee amputee and uses a prosthetic knee and
foot, which limits his mobility. (ECF No. 1 ¶ 20.) Mr. Harrold's claims stem from his

_____

[2] In considering the Motion to Dismiss, (ECF No. 5), the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to Mr. Harrold. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

The Court will also consider the nine-minute video of body worn camera footage submitted by Officer Hagen in support of the Motion to Dismiss. (ECF No. 6-1.) However, pursuant to a recent directive from the United States Court of Appeals for the Fourth Circuit, the Court will *only* consider the video "to the extent that [it] 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' [Mr. Harrold's] allegations, rendering [his] allegations implausible." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024) (quoting *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024).) As a result, the Court will not credit Mr. Harrold's allegations to the extent Officer Hagen's relevant footage "clearly depicts a set of facts contrary to those alleged in the complaint" or "blatantly contradicts' [Mr. Harrold's] allegations, rendering [his] allegations implausible." *Id.* (quotation marks and citation omitted).

The Court is permitted to consider this footage for this limited purpose because the footage "is 'integral' to the complaint and its authenticity is not challenged." *Sletten*, 109 F.4th at 679. Although Mr. Harrold states that the body worn camera footage in ECF No. 6-1 is "unauthenticated", he does not challenge whether the footage is a true and accurate copy of what Officer Hagen's body worn camera captured on the night of Mr. Harrold's arrest, nor does he contend that the footage was altered in any way. (ECF No. 8, at 2–5.) Furthermore, Mr. Harrold cites to the footage in his Complaint, (ECF No. 1 ¶ 67), and relies on the footage in support of his Opposition, (ECF No. 8, at 10–11, 26). Plainly, the footage is integral to the Complaint.

Finally, as Exhibits to his Reply, Officer Hagen attaches the following: (1) Officer Hagen's Certificate of Authenticity, (ECF No. 10-1); and (2) Captain Michael S. Breeden's Certificate of Authenticity, (ECF No. 10-2). Both Exhibits certify that ECF No. 6-1 is a true and accurate copy of the entire video captured by Officer Hagen's body worn camera during his search and arrest of Mr. Harrold at the VA Cards dealership on December 26, 2021. (ECF No. 10-1, at 1; ECF No. 10-2, at 1.)

December 26, 2021 arrest by Officer Hagen of the Chesterfield County Police Department ("CCPD").  (ECF No. 1 ¶¶ 18, 24, 34.)

### 1.    Mr. Harrold Breaks Into a VA Cars Dealership in the Evening

During the evening of December 26, 2021, "[f]or reasons that are unclear [to him]", Mr. Harrold broke into the VA Cars dealership in Chesterfield County, Virginia, by breaking one of the dealership's glass doors.  (ECF No. 1 ¶¶ 2–3, 23, 26.)  While breaking into the dealership, Mr. Harrold triggered a security alarm, which resulted in an emergency call to CCPD.  (ECF No. 1 ¶¶ 23–24.)  Multiple CCPD officers arrived at the scene, including Officer Hagen and his police dog, Kona.  (ECF No. 1 ¶¶ 23–24.)

After CCPD officers arrived at the scene, Mr. Harrold "went up a flight of stairs" to the second floor of the building and "waited in a storage room."  (ECF No. 1 ¶ 29.)  Mr. Harrold explains that at this time, "[h]e was scared, confused, and did not know what to do, but he intended to wait in the storage room until he was arrested."  (ECF No. 1 ¶ 30.)  At an unidentified point in time, Mr. Harrold "calle[d] out to the police, 'I am not a threat'", or words of similar effect.  (ECF No. 1 ¶ 32.)

After "other police officers . . . secured the perimeter of the building, Officer Hagen entered with [Kona] on a leash", and "Officer Hagen and [Kona] began a search of the building." (ECF No. 1 ¶ 35.)

### 2.    After CCPD Officers Shout Six Explicit Warnings, Kona Forcibly Subdues Mr. Harrold While Officer Hagen Handcuffs Him

CCPD policy requires officers to give verbal warnings whenever an officer releases a canine.  (ECF No. 1 ¶ 64.)  When searching large areas, officers must give multiple warnings. (ECF No. 1 ¶ 64.)

Mr. Harrold notes that at some point prior to his arrest, he "heard the sound of police officers" but, read favorably, alleges that once Officer Hagen found him, no warnings were issued. (ECF No. 1 ¶¶ 33, 44.) Prior to Mr. Harrold's arrest, CCPD officers had already issued six warnings:

(1)     After a CCPD officer entered the dealership by breaking out the remaining glass in the dealership's doorway, and as Kona entered the building, a CCPD officer shouted an initial warning: "Chesterfield police canine!" (ECF No. 6-1, at 01:14–1:46.)

(2)     Running with Kona on a leash toward a staircase to the second floor, Officer Hagen shouted a second warning: "Police canine, come on out now and I'll release the dog and the dog bites! You will be bit! You understand me?" (ECF No. 6-1, at 01:46–01:53.)

(3)     As Officer Hagen and Kona ascended the staircase to the second floor, Officer Hagen repeated this warning a third time, shouting: "Police canine, come on out now!" (ECF No. 6-1, at 01:46–01:53.)

(4)     After Office Hagen and Kona reached the second floor, Officer Hagen shouted a fourth warning: "Police canine, come on out now!" (ECF No. 6-1, at 01:59–02:00.) Officer Hagen then shouted: "Find him, find him!" (ECF No. 6-1, at 02:01–02:03.)

(5)     As Officer Hagen and Kona searched the second floor, he gave a fifth warning: "Police canine, come on out now!" (ECF No. 6-1, at 02:10–02:12.) Officer Hagen then told Kona: "Find him, find him, find him, find him." (ECF No. 6-1, at 02:13–02:18.)

(6)     After entering the same room where he would find Mr. Harrold approximately one minute and sixteen seconds later, Officer Hagen provided a sixth and final warning, loudly stating: "Police canine!" (ECF No. 6-1, at 02:18–02:20; 3:35–3:38.)[3]

As Officer Hagen and Kona searched the room, which was packed with boxes, shelves, and computer equipment, Officer Hagen repeatedly stated: "Where's he at?" (ECF No. 6-1, at 02:19–03:38.) Kona and Officer Hagen then entered a narrow aisle that was cluttered with

---

[3] This footage blatantly contradicts Mr. Harrold's Complaint to the extent he alleges that Officer Hagen failed to give *any* warning at any point in time. (*See* ECF No. 1 ¶¶ 64–65.)

numerous objects including boxes, computer equipment, and office chairs. (ECF No. 6-1, at 03:10–3:40.) Officer Hagen ultimately located Mr. Harrold "with his head down", "lay[ing] still on the floor" of the narrow aisle, which amounted to "a small room with no exit." (ECF No. 1 ¶¶ 57, 58.) Specifically, Mr. Harrold was balled up in the narrow aisle, with his hands out of view, passively resisting. (No. 6-1, at 03:37.) Mr. Harrold was "cornered . . . with no exit", as Officer Hagen, "with backup," blocked "[t]he only entry way to the room." (ECF No. 1 ¶ 58.) Furthermore, "the building as a whole was surrounded by law enforcement officers." (ECF No. 1 ¶ 58.)

Kona initially walked past Mr. Harrold while Officer Hagen still held the leash, albeit without slack. (ECF No. 6-1, at 03:31–35.)[4] After locating Mr. Harrold, Officer Hagen failed to issue a seventh oral warning, and instead "gave a [silent hand] signal to [Kona] to sic Mr. Harrold." (ECF No. 1 ¶ 45; ECF No. 6-1 3:26–3:39.) Kona complied. (ECF No. 1 ¶ 45.) Kona's "attack was focused on Mr. Harrold's buttocks, anus", scrotum, legs, and amputated stump. (ECF No. 1 ¶ 49.) While Officer Hagen commanded Mr. Harrold to "show me your hands" and "stop resisting", he attempted to handcuff Mr. Harrold. (ECF No. 6-1, at 03:40–03:59.) While Officer Hagen attempted to handcuff Mr. Harrold, Mr. Harrold shouted: "Get him off!" and "Pull him off!" (ECF No. 6-1, at 03:55–03:57.) An officer shouted back: "Not until you are in handcuffs!" (ECF No. 6-1, at 03:55–03:57.) Kona continued to "attack Mr. Harrold . . . for an extended period of time." (ECF No. 1 ¶ 76.)

---

[4] This footage blatantly contradicts Mr. Harrold's allegation that Kona first found Mr. Harrold and licked his face, leading Mr. Harrold to "fully expect[] that soon a police officer would ask him to surrender." (ECF No. 1 ¶¶ 38, 40.) The upshot of that disparity is discussed later.

Immediately after Officer Hagen handcuffed Mr. Harrold, Officer Hagen placed his hands on Kona's harness and pulled; while still pulling on Kona's harness, Officer Hagen maneuvered around the cluttered, narrow aisle and, with some difficulty, separated Kona from Mr. Harrold while he remained lying on the ground. (ECF No. 6-1, at 04:02–04:10.)[5]  After Mr. Harrold was in handcuffs, officers found a "small utility knife" among his possessions. (ECF No. 1 ¶ 21.)

### 3.    Mr. Harrold's Resulting Injuries

"Mr. Harrold sustained widespread and severe, deep dog bites over multiple areas of his body", namely his buttocks, anus, scrotum, legs, and amputated stump. (ECF No. 1 ¶¶ 49, 74.) Mr. Harrold bled "profusely from the wounds sustained" during his arrest. (ECF No. 1 ¶ 73.) Mr. Harrold's clothing, shoes, and prosthetic leg were "covered in blood," and a tourniquet and Israeli bandage[6] were applied at the scene to prevent Mr. Harrold from bleeding out. (ECF No. 1 ¶¶ 73, 77.) Due to Mr. Harrold's injuries and blood loss, he was transported by ambulance to Chippenham Hospital's emergency department. (ECF No. 1 ¶ 78.) Some of Mr. Harrold's wounds became infected. (ECF No. 1 ¶ 74.) Mr. Harrold contracted meningitis several months after the incident, and he has suffered additional bodily injuries including scarring and deformity. (ECF No. 1 ¶¶ 79, 80.) Mr. Harrold has also suffered emotional and economic harm as a result of the arrest. (ECF No. 1 ¶ 80.)

---

[5] This footage blatantly contradicts Mr. Harrold's allegation that "Officer Hagen continued allowing [Kona] to attack Mr. Harrold, even as Mr. Harrold made it to his feet and stood with his hands behind his back, making no attempt to flee, and posing a threat to no one." (ECF No. 1 ¶ 48).  The upshot of this disparity is discussed later.

[6] Also known as an Emergency Bandage, an Israeli bandage is a specifically designed, first-aid device that is used to stop bleeding from traumatic hemorrhagic wounds in pre-hospital emergency situations.

**B.** <u>**Procedural Background**</u>

In his Complaint Mr. Harrold asserts eight counts:

**Count I:**     Deprivation of Civil Rights under the Fourth Amendment–Unlawful Seizure–against Officer Hagen in his personal capacity pursuant to 42 U.S.C. § 1983.

**Count II:**    Deprivation of Civil Rights under the Fourth Amendment–Excessive Force–against Officer Hagen in his personal capacity pursuant to 42 U.S.C. § 1983.

**Count III:**   Deprivation of Civil Rights under the Fourth Amendment against Officer Hagen in his official capacity pursuant to 42 U.S.C. § 1983.

**Count IV:**    Assault under Virginia common law.

**Count V:**     Battery under Virginia common law.

**Count VI:**    Intentional Infliction of Emotional Distress ("IIED") under Virginia common law.

**Count VII:**   Negligence under Virginia common law (pleaded in the alternative).

**Count VIII:**  Gross Negligence under Virginia common law (pleaded in the alternative).

(ECF No. 1, at 13–19.)

On January 11, 2024, Officer Hagen filed the instant Motion to Dismiss. (ECF No. 5.)

Officer Hagen argues that dismissal is proper under Fed. R. Civ. P. 12(b)(6). (ECF No. 5, at 1.)

On January 25, 2024, Mr. Harrold filed his opposition to the Motion to Dismiss. (ECF No. 8.)

The same day, Mr. Harrold filed a Motion for Hearing. (ECF No. 9.) On January 31, 2024,

Officer Hagen replied to Mr. Harrold's opposition. (ECF No. 10.)

For the reasons articulated below, the Court will grant the Motion to Dismiss.

(ECF No. 5.) The Court will deny as moot the Motion for Hearing. (ECF No. 9.)

7

## II.  Standard of Review

### A.      Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Giacomelli*, 588 F.3d at 193 (citation omitted).  The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty, Md.*, 684 F.3d 462, 467 (4th Cir. 2012)

(concluding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

### III. Analysis

Officer Hagen seeks dismissal of all eight counts in the Complaint.  He seeks relief on the following grounds:  (1) Mr. Harrold fails to state an official capacity claim (Count III); (2) Counts I and II are duplicative and therefore should be considered as a single Count;[7] (3) Officer Hagen is entitled to qualified immunity, and therefore Mr. Harrold fails to state a claim for Counts I, II, IV, and V; (4)  Mr. Harrold fails to state a claim for intentional infliction of emotional distress ("IIED") (Count VI); (5) Mr. Harrold fails to state a claim for negligence (Count VII);[8] and (6) Mr. Harrold fails to state a claim for gross negligence (Count VIII).  (ECF No. 6, at 9–10, 18, 20–22.)

As it must at this juncture, the Court accepts Mr. Harrold's well-plead allegations as true, but does not credit Mr. Harrold's allegations to the extent Officer Hagen's body worn camera footage "clearly depicts a set of facts contrary to those alleged in the complaint" or "blatantly contradicts' [Mr. Harrold's] allegations, rendering [his] allegations implausible." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679–80 (4th Cir.  2024) (quotation marks omitted).

---

[7] As discussed in more detail below, Mr. Harrold concedes in his Opposition that Counts I and II are duplicative.  (*See* ECF No. 1, at 6.)

[8] In his Opposition, Mr. Harrold consents to the dismissal of Count VII, which pleads negligence.  (ECF No. 8, at 28.)

For the reasons articulated below, the Court concludes that Mr. Harrold fails to state any federal claim against Officer Hagen. The Court will, in its discretion, decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(a), (c)(3).[9]

### A.   Mr. Harrold Fails to State a Claim for Deprivation of Civil Rights Under the Fourth Amendment Under 42 U.S.C. § 1983 (Count III)

In his Opposition, Mr. Harrold clarifies that he is not asserting a claim in Count III under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (ECF No. 8, at 5–6.) Rather, Mr. Harrold asserts an official capacity claim against Officer Hagen "seek[ing] only declaratory and prospective injunctive relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908)." (ECF No. 8, at 1.) Because Mr. Harrold alleges only a past violation of his rights, rather than any ongoing violation, this claim fails as a matter of law.

### 1.   Legal Standard: *Ex Parte Young*

"The *Ex Parte Young* exception to the Eleventh Amendment 'allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute.'" *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 746 (4th Cir. 2018) (quoting *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002)). "Under this exception, a state official who acts in violation of federal law is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.'" *Id.* at 746–47 (quoting *Ex Parte Young*, 209 U.S.

---

[9] "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

10

at 160). "By subjecting a state official to a legal action, the *Ex Parte Young* exception seeks to 'conform [his or her] *future* conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury.'" *Id.* at 747 (quoting *Quern v. Jordan*, 440 U.S. 332, 337(1979) (emphasis added)).

To take advantage of this narrow exception, a plaintiff must bring an action against the proper state officials, *see Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 249 (4th Cir. 2012), and must properly characterize the relief sought as prospective and injunctive in nature, *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). "Determining whether a suit may proceed under *Ex [P]arte Young* requires only that the court 'conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Pickering v. Virginia State Police*, 59 F.Supp.3d 742, 747 (E.D. Va. 2014) (quoting *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011)).

**2.    Mr. Harrold's *Ex Parte Young* Founders Because He Fails to Allege Any Ongoing Violation of His Rights**

Officer Hagen is a police officer employed by the County of Chesterfield.  (ECF No. 1 ¶ 8.)  Mr. Harrold fails to provide any case law or argument explaining why the Court should consider Officer Hagen to be a proper "state official" for the purposes of his *Ex Parte Young* claim.  In any event, even if Officer Hagen were properly considered a state official in this context, this claim nevertheless must be dismissed because Mr. Harrold fails to allege any ongoing violation of his rights. *See Pickering*, 59 F. Supp. 3d at 747.

**B.     Mr. Harrold Concedes that Count I and II are Duplicative, and Can Be Considered as a Single Claim for Excessive Force**

Mr. Harrold correctly concedes that Counts I and II are duplicative.[10]  Out of deference to

Mr. Harrold, who is the non-moving party, the Court will grant Mr. Harrold's request and will

consider the two Counts as a single claim for excessive force under 42 U.S.C. § 1983, and will

consider Count I to be subsumed within Count II.  The Court will dismiss Count I, and will

analyze Count II below.

**C.     Officer Hagen is Entitled to Qualified Immunity, Requiring the Court to Dismiss Mr. Harrold's § 1983 Claim for Excessive Force (Count II)**

In Count II, Mr. Harrold asserts a claim against Officer Hagen under 42 U.S.C. § 1983

for excessive force.  For the reasons articulated in detail below, he plausibly alleges that Officer

Hagen's actions amount to excessive force in violation of the Fourth Amendment.  Mr. Harrold

fails, however, to establish that the right violated was clearly established at the time of the

violation.  As a result, Office Hagen is entitled to qualified immunity.  The Court must dismiss

Count II.

---

[10] In his Opposition, Mr. Harrold clarifies that "Count I relates to the initial seizure of Mr. Harrold's person using the K-9 police dog[,] while Count II involves Officer Hagen's actions that resulted in the prolonged dog bite attack of Mr. Harrold." (ECF No. 8, at 6.)  Mr. Harrold explains that he "originally believed it made sense to plead these claims separately", but upon further review of the case law, he "does not object to having the Counts considered as one." (ECF No. 8, at 6.)  Mr. Harrold states that "[i]f the Court finds Counts I and II should not be pleaded separately, Plaintiff asks the Court to consider the two Counts as a single claim for excessive force under 42 U.S.C. § 1983, and consider Count I to be subsumed within Count II." (ECF No. 8, at 6.)  In support of his Motion to Dismiss, Officer Hagen explains that "[a] seizure allegedly using excessive force in effectuating an arrest (Count II) would be an unreasonable seizure in violation of the Fourth Amendment (Count I)." (ECF No. 6, at 11.)  Accordingly, Officer Hagen argues, "Count II should be dismissed as it is duplicative of and subsumed within Count I." (ECF No. 6, at 11 citing *Graham v. Connor*, 490 U.S. 386, 394-96 (1989).)

### 1.      Legal Standard:  Qualified Immunity

Law enforcement officers sued under § 1983 are protected by qualified immunity "when performing their duties within the scope of their employment insofar as their conduct does not breach 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not merely a defense to liability but is "an immunity from suit" and courts must therefore "scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation." *Id.*; *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (collecting cases).)

"The goal of the doctrine is to balance two important concerns, first the need to hold public officials accountable when they exercise power irresponsibly and second the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 357 (4th Cir. 2010) (internal quotation marks and citations omitted).  "The purpose of the immunity is to allow some room for discretionary judgment in what are indisputably difficult circumstances and not to have the prospect of being blind-sided in hindsight discourage officers from the constructive tasks they can in fact perform." *Id.* (citing *Gooden v. Howard County*, 954 F.2d 960, 967 (4th Cir.1992) (en banc)).  "Thus officers will not be held liable, even if they violate statutory or constitutional rights, unless they had prior guidance which would allow them to determine that their contemplated action was improper." *Id.*

Determining whether a defendant is entitled to qualified immunity involves a two part inquiry as the Court must determine:  (1) whether the facts "make out a violation of a

constitutional right"; and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotations omitted). For a right to be "clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *M.C. ex rel. Crawford v. Amrhein*, 598 F.App'x 143, 147 (4th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).)

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. A defendant "is entitled to qualified immunity if either prong is not satisfied." *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019), *as amended* (June 10, 2019) (citing *Pearson*, 555 U.S. 223 at 244–45)).

### 2.    Legal Standard:  Federal Excessive Force Violations

"It is well-established that all claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its reasonableness standard, including claims that police canines were improperly deployed." *Melgar*, 593 F.3d at 355 (internal quotation marks and citations omitted); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178 (4th Cir. 1998); *see also Erreguin v. Accomack Cnty.*, No. 2:08CV475, 2009 WL 10731049 (MSD), at *5 (E.D. Va. Mar. 6, 2009). The standard of review for allegations of unreasonable force under the Fourth Amendment is "an objective one," and "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). "Reasonableness is evaluated from the officer's perspective in recognition of the fact that

officers cannot be expected to respond to information they did not possess at the time they acted[.]" *Melgar*, 593 F.3d at 355 (internal citation omitted).

In determining the objective reasonableness of an officer's use of force, the United States Court of Appeals for the Fourth Circuit has explicitly rejected taking "a 'segmented view of the sequence of events' . . . concluding that it 'miss[es] the forest for the trees.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).) Rather, the Fourth Circuit has "determined that '[t]he better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Id.* (quoting *Rowland*, 41 F.3d at 173). "*Graham v. Connor* also frames the reasonableness determination in a larger perspective, evaluating all relevant factors rather than any one in isolation." *Rowland*, 41 F.3d at 173.

The *Graham* factors include: (1) "'the severity of the crime at issue'"; (2) "'whether the suspect poses an immediate threat to the safety of the officers or others'"; and (3) "whether [he or she] is actively resisting arrest or attempting to evade arrest by flight." *Southworth v. Jones*, 529 F. Supp. 3d 454, 460 (E.D. Va. 2021) (cleaned up) (quoting *Graham*, 490 U.S. at 396).

The Fourth Circuit has also instructed that when considering the "facts and circumstances" of each case, the extent of the plaintiff's injury is also relevant consideration. *Jones v. Buchanan*, 325 F.3d 520, 527–28 (4th Cir. 2003). "Furthermore, any use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and such calculus must make allowance for the reality that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Erreguin*, 2009 WL 10731049, at *5 (quoting *Graham*, 490 U.S. at 396–97).

15

An officer's "failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context." *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179 (4th Cir. 1998) (quoting *Kopf v. Wing*, 942 F.2d 265, 266 (4th Cir. 1991)). Additionally, when considering the objective reasonableness of a prolonged seizure by a police dog, whether the police dog's actions affected a defendant's ability to immediately submit to arrest is a relevant consideration. *Kopf*, 942 at 268 ("We believe that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum.")

### 3. Because the Constitutional Violation Was not Clearly Established, Officer Hagen Properly Invokes Qualified Immunity

Officer Hagen invokes qualified immunity on the grounds that his actions did not violate "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" (ECF No. 6, at 12 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).) Considering the totality of the circumstances, the Court is particularly troubled by the severity of Mr. Harrold's injuries, the prolonged nature of Kona's bite, and Officer Hagen's failure to issue an additional verbal warning upon locating Mr. Harrold while he lay passively on the ground. Mr. Harrold plausibly alleges a violation of his Fourth Amendment rights based on Officer Hagen's use of excessive force when arresting him. Nonetheless, despite officers shouting at least six warnings regarding the presence of a police canine (five from Officer Hagen and one from another CCPD officer), (ECF No. 6-1, at 01:14-02:20),[11] Mr. Harrold failed to come out of

---

[11] Officer Hagen's briefing, which pre-dates *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670 (4th Cir. 2024), asks the Court to consider the entirety of Officer Hagen's nine-minute body worn camera footage. (ECF No. 6, at 9.) He heavily relies on the footage throughout his briefing, emphasizing, for example, that Mr. Harrold "hid behind a partial wall next to the surveillance camera feed", and that "there were no other officers immediately behind Officer

his hiding place or orally respond during a suspected commercial burglary, forcing law enforcement to seek him out. (*See* ECF No. 1 ¶¶ 30, 37.) Under these circumstances, the Court is unable to conclude that it would have been clear to a reasonable officer in Officer Hagen's position that Officer Hagen's deployment of Kona, which was preceded by at least *some* warning, was unlawful. Therefore, Mr. Harrold fails to satisfy the second prong of the qualified immunity analysis, and Officer Hagen is entitled to qualified immunity for Count II. The Court will address each prong in depth below.

###    i.    Mr. Harrold Plausibly Alleges a Violation of the Fourth Amendment

"[I]n light of the circumstances in the particular case at hand", the Court will first address the first prong of the qualified immunity analysis: whether the facts alleged "make out a violation of a constitutional right." *See Pearson*, 555 U.S. 223, 232, 236 (2009). Mr. Harrold's excessive force claim, which arises in the context of an arrest of a free citizen, properly invokes the protections of the Fourth Amendment. (*See* ECF No. 1, at 14); *see also Graham*, 490 U.S. at 396. Accordingly, to determine if Officer Hagen violated Mr. Harrold's constitutional rights, the

---

Hagen and Kona when Officer Hagen gave the bite command." (ECF No. 6, at 16–17.) The Court does not consider these arguments nor these facts in reaching its decision today. As previously articulated, in light the Fourth Circuit's binding guidance in *Doriety*, the Court *only* considers Officer Hagen's body worn camera footage to the limited extent that it "clearly depicts a set of facts contrary to those alleged in the complaint" or "blatantly contradicts' [Mr. Harrold's] allegations, rendering [his] allegations implausible." 109 F.4th at 679–80.

The Court follows *Doriety* reluctantly. As the *Doriety* court itself warned, "courts must be mindful not to short-circuit at the motion to dismiss stage a plaintiff's plausible claim of excessive force based on a video that does not blatantly contradict those allegations." 109 F.4th at 681. But allowing a Court to consider body worn camera footage in *any* capacity in a § 1983 case does just that. The Court is loath to consider Officer Hagen's body worn camera footage at all at this nascent stage—before discovery has begun and before Mr. Harrold has been given a chance to issue discovery requests and proffer evidence in support of his side of the story. Nonetheless, the Court is bound by *Doriety*'s holding at this time.

Court must apply an "objective reasonableness" test, which requires a "careful balancing of 'the nature and quality of the intrusion on [Mr. Harrold's] Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.*

Here, reading Mr. Harrold's well-plead allegations favorably and combining them with Officer Hagen's body worn camera footage—which the court considers *only* to the extent it clearly depicts a set of facts contrary to those alleged in the Complaint or blatantly contradicts Mr. Harrold's allegations—establish that Officer Hagen's application of force was not objectively reasonable.

Turning to the first *Graham* factor—the severity of the crime at issue—Mr. Harrold forcibly broke into the VA Cars dealership in the evening by breaking a glass door to the building. (ECF No. 1 ¶¶ 23–24.) A reasonable officer in the same circumstances could conclude that a burglary by Mr. Harrold was in progress. Federal law defines "burglary" as a violent crime. *See* 18 U.S.C. § 924(e)(2)(B).[12] This factor weighs in favor of Officer Hagen.

*Graham* factor two— whether the suspect poses an immediate threat to the safety of the officers or others—weighs slightly in Mr. Harrold's favor. Mr. Harrold forcibly broke into a car dealership at night, and from a reasonable officer's perspective, he could have even been armed when doing so. Nonetheless, at the time Officer Hagen located Mr. Harrold, he "lay motionless

---

[12] The definition of "violent felony" found in § 924(e)(2)(B)(ii) states in pertinent part:

(B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year . . . that–

     \*     \*     \*

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

§ 924(e)(2)(B)(ii).

on the floor, with his head down." (ECF No. 1 ¶ 57.)  Furthermore, Mr. Harrold was on the floor of a narrow aisle, which amounted to "a small room with no exit." (ECF No. 1 ¶ 58.)  Mr. Harrold was "cornered", as Officer Hagen, "with back up," blocked "[t]he only entry way to the room." (ECF No. 1 ¶ 58.)  Although it is possible that Mr. Harrold could have been armed, Mr. Harrold's body positioning at this time supports a conclusion that he did not pose an immediate threat to Officer Hagen's safety at the moment Officer Hagen discovered him and silently signaled Kona to attack in lieu of issuing an additional warning. (ECF No. 1 ¶ 45; ECF No. 6-1 3:26–3:39.)  When confronted directly, Mr. Harrold engaged in passive, not active, resistance. *C.f. Putman v. Harris*, 66 F.4th 181, 188 (4th Cir. 2023); *see Barker v. Gaylor*, No. 2:20-CV-00357, 2021 WL 3354161, at *6 (S.D.W. Aug. 2, 2021).

The final *Graham* factor—regarding whether Mr. Harrold actively resisted arrest or attempted to evade arrest by flight—weighs slightly in Mr. Harrold's favor.  Rather than immediately surrender when CCPD officers arrived at the scene, Mr. Harrold fled up a flight of stairs. (ECF No. 1 ¶ 29.)  After Mr. Harrold reached the second floor, he "waited in a storage room." (ECF No. 1 ¶ 29.)  Despite officers shouting at least six warnings regarding the presence of a police canine (five from Officer Hagen and one from another CCPD officer), (ECF No. 6-1, at 01:14-02:20), Mr. Harrold failed to come out of his hiding place or orally respond, forcing law enforcement to seek him out. (ECF No. 1 ¶¶ 30, 37.)  A reasonable officer in Officer Hagen's situation could conclude that Mr. Harrold, at least initially, attempted to evade arrest by flight.

Nonetheless, at the time Officer Hagen encountered Mr. Harrold and subsequently released Kona, Mr. Harrold was at most passively resisting by lying prone on the floor. (ECF No. 1 ¶ 57.)  *See Kopf*, 924 F.2d at 268 ("We believe that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog

19

bites his scrotum.") Considering the totality of the circumstances, the Court is unable to conclude on this limited record that Mr. Harrold was actively resisting arrest or attempting to flee at the time Officer Hagen discovered Mr. Harrold.

Finally, Mr. Harrold's injures from Kona's prolonged attack were undeniably severe. Mr. Harrold describes gruesome injuries that were so "widespread and severe" that they resulted in life-threatening blood loss requiring emergency medical intervention. (ECF No. 1 ¶¶ 73, 77– 78.) Some of these injuries are long lasting and include "scarring and deformity" as well as emotional and economic harm. (ECF No. 1 ¶¶ 79, 80.) Reading the Complaint liberally, it is plausible that these lasting injuries may have been avoided altogether if Officer Hagen had issued a final warning upon locating Mr. Harrold while he lay passively on the ground, or if Officer Hagen had released Kona from Mr. Harrold sooner and asked him to surrender.

Viewing Officer Hagen's prolonged deployment of Kona "in full context, with an eye toward the proportionality of the force in light of all the circumstances", and "evaluating all relevant factors rather than any one in isolation", it is plausible that Officer Hagen's use of force was objectively unreasonable for failing to issue a final warning before deploying Kona. *Rowland*, 41 F.3d at 173. The Court now turns to prong two of its qualified immunity analysis: "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.

### ii.    The Constitutional Violation Was Not Clearly Established

For a right to be "clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *M.C. ex rel. Crawford*, 598 F. App'x at 147 (4th Cir. 2015) (quoting *Anderson*, 483 U.S.

at 640).  An officer's "failure to give a warning before releasing a police dog is objectively

unreasonable in an excessive force context." *Vathekan*, 154 at 179 (quoting *Kopf*, 942 at 266).

Here, Officer Hagen deployed a police dog to bite Mr. Harrold, who had forcibly broken

into a commercial building at night, who fled after CCPD officers arrived, and who, from a

reasonable officer's perspective, could have been armed.  The Court credits Mr. Harrold's well-

plead allegation, which is not contradicted by video evidence, that after locating Mr. Harrold,

Officer Hagen failed to issue a warning, and instead merely silently signaled Kona to sic Mr.

Harrold.  (ECF No. 1 ECF No. 1 ¶ 45; ECF No. 6-1 3:26–3:39.)  In light of *Doriety*, however,

the Court is also obligated to credit Officer Hagen's video footage to the extent it shows that

officers shouted at least six warnings regarding the presence of a police canine (five from Officer

Hagen and one from another CCPD officer), (ECF No. 6-1, at 01:14-02:20), because it blatantly

contradicts Mr. Harrold's Complaint to the extent it suggests that Officer Hagen failed to give

any warning at all.  On this record, the Court cannot conclude that a reasonable officer in Officer

Hagen's situation would have concluded that Officer Hagen's deployment of Kona was

unlawful.  While in the same room approximately one minute and sixteen seconds earlier,

Officer Hagen loudly announced "Police canine!"  (ECF No. 6-1, at 02:18–02:20; 3:35–3:38.)

As a result, Officer Hagen's conduct did "not breach clearly established statutory or

constitutional rights of which a reasonable person would have known." *Sigman*, 161 F.3d at 786

(quotation marks omitted).  Officer Hagen is therefore entitled to qualified immunity, and the

Court will dismiss Count II on this ground.

**D.     The Court Will Dismiss Mr. Harrold's Claim for Negligence (Count VII)**

Officer Hagen moves to dismiss Mr. Harrold's claim for negligence for failure to state a

claim. (ECF No. 6, at 20.)  In response, Mr. Harrold "consents to the dismissal of Count VII."

(ECF No. 8, at 28.)  The Court will dismiss Count VII.

**E.     The Court Will Decline to Exercise Supplemental Jurisdiction Over Mr. Harrold's Remaining State Law Claims**

The four remaining claims allege causes of action under Virginia law over which the

Court does not have original jurisdiction.[13]   The Court may consider the remaining state law

claims only if it exercises supplemental jurisdiction.  Because all relevant factors weigh against

exercising supplemental jurisdiction, the Court will decline to do so here.  *See, e.g.*, *Ruttenberg*

*v. Jones*, 603 F. Supp. 2d 844, 873 (E.D. Va. 2009), *aff'd*, 375 F. App'x 298 (4th Cir. 2010)

(declining to exercise supplemental jurisdiction over state law claims after dismissing all federal

claims in § 1983 action).

**1.     Legal Standard:  Supplemental Jurisdiction After Federal Claims Are Dismissed**

Federal district courts have supplemental jurisdiction over state law claims that "form

part of the same case or controversy" as a federal claim.  28 U.S.C. § 1367(a).  A district court,

however, may decline to exercise supplemental jurisdiction over state law claims if the district

court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3); *see*

*also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (generally, if federal

claims are dismissed before trial, state claims should be dismissed as well).

---

[13] The claims still at bar are:  Count IV (assault); Count V (battery); Count VI (intentional
infliction of emotional distress); and Count VIII (gross negligence).

"The doctrine of supplemental jurisdiction is one of flexibility, and there is no 'mandatory rule' requiring dismissal when the federal claim is disposed of before trial." *Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 297 (4th Cir. 2003); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [subject-matter] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); *Shanaghan v. Cahill*, 58 F.3d 106,109 (4th Cir. 1995) ("The doctrine of supplemental jurisdiction indicates that federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away."). Among the factors that inform the Court's discretionary determination are "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110.

### 2.     **The Court Will Decline to Exercise Supplemental Jurisdiction**

Although the court has unbridled discretion in deciding whether to exercise supplemental jurisdiction in this case, *Carlsbad Tech., Inc.*, 556 U.S. at 639, the United States Court of Appeals for the Fourth Circuit advises that the Court *should* consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy," *Shanaghan*, 58 F.3d at 110. An evaluation of these four factors uniformly favors dismissal.

As to the federal policy factor, none of the remaining counts directly involve federal policy. All remaining counts allege causes of action under Virginia law.

The Court's consideration of comity and judicial economy likewise favors dismissal. Mr. Harrold's remaining claims rely entirely upon Virginia law. It would be imprudent for this Court, one of limited jurisdiction, to suggest that it could more readily decide matters of Virginia

23

law than Virginia courts could.  Allowing a state court to address state law matters would best serve judicial economy.

Fairness and convenience to the parties also weigh in favor of the Court declining supplemental jurisdiction. This case remains in an early stage of litigation.  Mr. Harrold has filed a single Complaint, and Officer Hagen has moved to dismiss that pleading.  The Court has not decided any disputed state-law-based claims.  The Court has not entered any discovery orders, and no matters will remain under consideration after this Court issues its decision.  Were Mr. Harrold to subsequently file his claims in a court of appropriate jurisdiction, the parties would, for all intents and purposes, begin at the same stage of the litigation process.  Accordingly, the Court's consideration of the convenience to the parties also favors dismissal.

### IV.  Conclusion

For the reasons articulated above, the Court will grant the Motion.  (ECF No. 5.)  The Court will dismiss Mr. Harrold's federal law claims (Counts I, II, and III) with prejudice.  The Court will also dismiss Count VII, negligence, with prejudice.  Because the Court declines to exercise supplemental jurisdiction over Mr. Harrold's remaining state law claims, the Court will dismiss these claims (Counts IV, V, VI, and VIII) without prejudice.

An appropriate Order shall issue.

Date: 9/27/24
Richmond, Virginia

_____ /s/
M. Hannah Lauck
United States District Judge

24